CHAD A. READLER
Acting Assistant Attorney General
GUSTAV W. EYLER
Acting Director, Consumer Protection Branch
JILL P. FURMAN
Deputy Director
JACQUELINE BLAESI-FREED
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044
Telephone: (202) 353-2809
Facsimile: (202) 514-8742
Email: Jacqueline.M.Blaesi-Freed@usdoj.gov

DAYLE ELIESON
United States Attorney

TROY K. FLAKE
Assistant United States Attorney
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101

*Attorneys for the United States*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Civil Case No. 2:18-cv-00283-JAD-PAL |
| Plaintiff, | |
| v. | **COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTIONS, AND OTHER EQUITABLE RELIEF** |
| **PATTI A. KERN**, in her individual capacity and doing business as Imperial Award Services, Money Securities, and Assets Unlimited; **ADVANCED ALLOCATION SYSTEMS, INC.** a Nevada corporation, also d/b/a Pacific Disbursement Report; **DISTRIBUTION REPORTING CENTER, INC.**, a Nevada corporation; **MARKETING IMAGE DIRECT, INC.**, a Nevada corporation, also Price Awards; **GLOBAL DATA FUNDING, INC.**, a Nevada corporation; **MONTGOMERY MARKETING, INC. LLC**, a Nevada | |

limited liability company; **FUNDING MANAGERS, INC.**, a Nevada corporation; **SPECIAL MONEY MANAGERS, INC.**, a Nevada corporation; **NORTH AMERICAN DISBURSEMENT AGENCY, INC.**, a Nevada corporation; **GOLDEN PRODUCTS SERVICE, INC.**, Nevada corporation; **PACIFIC ALLOCATION SYSTEMS, INC.**, a Nevada corporation; **EDGAR DEL RIO**, in his individual capacity and as an officer of NSD Products, Inc.; **NSD PRODUCTS INC.**, a Nevada corporation, also d/b/a NSD Printing; **SEAN O'CONNOR**, in his individual capacity; **EPIFANIO CASTRO**, in his individual capacity and as an officer of New Generation Graphics, Inc.; **NEW GENERATION GRAPHICS INC.**, a Nevada corporation; **ANDREA BURROW**, in her individual capacity, **STEPHEN FENNELL**, in his individual capacity and as an officer of Neptune Data Services, Inc., **NEPTUNE DATA SERVICES, INC.**, a Nevada corporation.

Defendants.

Plaintiff, the United States of America, by and through the undersigned attorneys, hereby alleges as follows:

**Nature of Action**

1. The United States brings this action for a temporary restraining order, preliminary and permanent injunctions, and other equitable relief pursuant to 18 U.S.C. § 1345, in order to enjoin the ongoing commission of criminal mail fraud in violation of 18 U.S.C. §§ 1341 and 1349. The United States seeks to prevent continuing and substantial injury to the victims of fraud.

2. Defendants are using the U.S. mail to engage in a massive predatory mail fraud scheme that affects primarily the elderly and vulnerable. Each individual defendant has participated in the scheme for at least six years.

3.      Over the course of the scheme, defendants have sent millions of solicitations via the U.S. mail to potential victims throughout the United States.  The solicitations appear to be sent by legitimate entities tasked with delivering substantial cash prizes. Those solicitations represent that the recipients have won a substantial prize and need to return a response card and a small fee, generally between $20 and $30, to receive the money.  To bolster the impression that recipients have won a prize, the solicitations are stylized as individualized communiqués—often including specific "claim numbers" or requiring a signature—and emphasize that only the named individual can respond.  Some solicitations appear to include personalized handwritten notes from the individuals purportedly responsible for notifying the recipients of their good fortune.

4.      Victims who send the requested fee do not receive the promised cash prize. Instead they receive nothing at all or a nearly worthless sweepstakes bulletin containing information about publicly-advertised sweepstakes.

5.      Contrary to the solicitations' representations, the solicitations are nothing more than form letters, generated from lead lists and mailed by the thousands.

6.      The corporate entities supposedly responsible for the solicitations are merely facades created to conceal the mailings' true sources.  The individuals who "sign" the solicitations and purportedly personally approve the communication, do not exist.

7.      The defendants target victims who respond to solicitations.  The defendants compile information from victims to respond into lists of "buyers" and send additional solicitations to individuals on those lists.  Defendants also rent the lists to other direct mailers, resulting in victims receiving solicitations from other schemes.

8.      Thousands of victims, many elderly or vulnerable, respond to the fraudulent solicitations and financial losses as a result of defendants' mail fraud scheme.  Since 2011, victims have paid defendants approximately $10 million.

9.      For the reasons stated herein, the United States requests injunctive relief pursuant to 18 U.S.C. § 1345 to enjoin defendants' ongoing scheme to defraud using the U.S. mail in violation of 18 U.S.C. §§ 1341 and 1345.

**Structure of the Schemes**

10.    Although the solicitations purport to come from a single corporate entity, many different entities have a role in creating, personalizing, mailing, and printing the solicitations, as well as processing the victim returns.

- *Direct mailers*.  Direct mailers orchestrate the scheme.  Among other things, they acquire and approve the solicitations, obtain lead lists, and direct the activities of the other scheme participants.

- *List Brokers*.  List brokers facilitate the renting of lead lists.  These lists are owned by direct mailers and contain demographic information of individuals most likely to send payments in response to fraudulent solicitations.

- *Printers*.  Printers print the solicitations and accompanying envelopes.  Printers assemble the solicitation packets, *i.e.*, fold the solicitations and insert them into envelopes, and transport the packets to mailing houses, which sort the solicitation shipments and send them via the U.S. mails to potential victims across the country.

- *Caging services*.  Caging services open victim responses, review them for victim and payment information, record victim information, and deposit victim payments.

- *Data Managers*.  Data managers create and maintain lists of solicitation recipients.  They remove from lead lists duplicate entries, incorrect mailing addresses, and information for individuals located in states that have acted to stop fraudulent mass mailing schemes.  Data managers also maintain lists of victims who respond to the direct mailer's own solicitations

**Jurisdiction and Venue**

11.    The Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1345 and 28 U.S.C. §§ 1331 and 1345.

12.    Venue is proper in the District of Nevada pursuant to 28 U.S.C. §§ 1391(b) and 1391(c) because defendants reside in this District or transact business in this District and defendants' actions giving rise to this case occurred in this District.

## Parties

13.    Plaintiff is the United States of America.

**A.    Direct Mailer Defendants**

14.    Defendant Patti A. Kern ("Kern"), a direct mailer, directs and controls the operations of the corporate defendants named in Paragraphs 16 through 26.  Kern does business as Imperial Award Services, Money Securities, and Assets Unlimited.  Kern has owned and managed direct mailers since at least 2004.  Kern resides in this district and, in connection with the matters alleged herein, transacts business in this District and throughout the United States.

15.    Kern and her associates mail solicitations through ten corporate entities, (herein after "direct mailing defendants").  All direct mailing defendants reside in this district and, in connection with the matters alleged herein, transact business in this District and throughout the United States.

16.    Defendant Advanced Allocation Systems, Inc., a direct mailer, is a Nevada corporation with its registered address at 8275 South Eastern Avenue, Suite 258, Las Vegas, NV 89123.  Advanced Allocation Systems, Inc. also does business as Pacific Disbursement Report and Distribution Reporting Services.

17.    Defendant Distribution Reporting Center, Inc., a direct mailer, is a Nevada corporation with its registered address at 8275 South Eastern Avenue, Suite 258, Las Vegas, NV 89123.

18.    Defendant Funding Managers, Inc., a direct mailer, is a Nevada corporation with its registered address at 8275 South Eastern Avenue, Suite 258, Las Vegas, NV 89123.

19.    Defendant Global Data Funding, Inc., a direct mailer, is a Nevada corporation with its registered address at 8275 South Eastern Avenue, Suite 258, Las Vegas, NV 89123.

20.     Defendant Marketing Image Direct, Inc., a direct mailer, is a Nevada corporation with its registered address at 8275 South Eastern Avenue, Suite 258, Las Vegas, NV 89123. Marketing Image Direct also does business as Imperial Award Services.

21.     Defendant Montgomery Marketing, Inc. LLC, a direct mailer, is a Nevada limited liability corporation with its registered address at 3342 Basler Street, North Las Vegas, NV 89030.

22.     Defendant North American Disbursement Agency, Inc., a direct mailer, is a Nevada corporation with its registered address at 8275 South Eastern Avenue, Suite 258, Las Vegas, NV 89123.

23.     Defendant Pacific Allocation Systems, Inc., a direct mailer, is a Nevada corporation with its registered address at 8275 South Eastern Avenue, Suite 258, Las Vegas, NV 89123.

24.     Defendant Special Money Managers, Inc., a direct mailer, is a Nevada corporation with its registered address at 8275 South Eastern Avenue, Suite 258, Las Vegas, NV 89123.

25.     Defendant All American Awards, Inc., a direct mailer, is a Nevada corporation with its registered address at 8275 South Eastern Avenue, Suite 258, Las Vegas, NV 89123.

26.     Defendant Golden Products Service, Inc., a direct mailer, is a Nevada corporation with its registered address at 8275 South Eastern Avenue, Suite 258, Las Vegas, NV 89123.

27.     In connection with the matters alleged herein Kern and direct mailing defendants have caused millions of fraudulent solicitations to be mailed to potential victims throughout the United States.

**B.    The Printer Defendants**

28.     Defendant Edgar Del Rio ("Del Rio"), a printer, is an officer of, directs, and controls the defendant NSD Products Inc.  NSD Products transacts or has transacted business in this district and throughout the United States.

29.     Defendant NSD Products, Inc. ("NSD Products"), a printer, is a Nevada corporation with its registered address at 8275 S. South Eastern Avenue, Suite 258, Las Vegas, NV 89123.  NSD Products also does business as NSD Printing.  NSD Products formerly sent out

fraudulent solicitations as a direct mailer.  NSD Products transacts or has transacted business in this district and throughout the United States.

30.     Defendant Sean O'Connor ("O'Connor"), a printer, currently works with Del Rio and NSD Products and previously worked for other printers used by Kern and her associates. O'Connor resides in this district and, in connection with the matters alleged herein, transacts business in this district and throughout the United States.

31.     Defendant Epifanio Castro ("Castro"), a printer, is an officer of, directs, and controls the operations of defendant New Generation Graphics, Inc.  Castro formerly operated as a direct mailer.  Epifanio Castro resides in this district and, in connection with the matters alleged herein, transacts business in this district and throughout the United States.

32.     Defendant New Generation Graphics, Inc. ("New Generation"), a printer, was a Nevada corporation with its registered address at 8275 S. South Eastern Avenue, Suite 258, Las Vegas, NV 89123.  New Generation has defaulted on its corporate status, but is still operating. New Generation transacts or has transacted business in this district and throughout the United States.

33.     In connection with the matters alleged herein, defendants Del Rio, NSD Products, O'Connor, Castro, and New Generation have caused millions of fraudulent solicitations to be mailed to potential victims throughout the United States.

**C.     Caging Defendant**

34.     Defendant Andrea Burrow, a cager, resides in this district and, in connection with the matters alleged herein, transacts business in this district and throughout the United States.

35.     In connection with the matters alleged herein Burrow has caused millions of fraudulent solicitations to be mailed to potential victims throughout the United States.

**D.     Data Defendants**

36.     Defendant Stephen Fennell ("Fennell"), a data manager, is an officer of, directs, and controls defendant Neptune Data Services, Inc.  Fennell resides in this district and, in connection with the matters alleged herein, transacts business in this district and throughout the United States.

37.     Defendant Neptune Data Services, Inc. ("Neptune"), a data defendant, is a Nevada corporation with its registered address at 705 Dinard Way, North Las Vegas, NV 89031. Neptune transacts or has transacted business in this district and throughout the United States.

38.     In connection with the matters alleged herein Fennell and Neptune have caused millions of fraudulent solicitations to be mailed to potential victims throughout the United States.

## Defendants' Ongoing Fraudulent Scheme

39.     During the course of last year, defendants have mailed more than 950,000 fraudulent solicitations to 38 states.  Those solicitations resulted in victims paying defendants approximately $1.6 million.

**A.     The Solicitations**

40.     Each week, Kern and associates send out between five and ten mailings, with each mailing being sent to least 2,000 to 5,000 potential victims.

41.     Those solicitations appear to be sent by organizations and individuals with official sounding names and titles, including "Notification Committee," "Director of Disbursements," or "Department of Legal Deposits."  *See* Exhibits 1-3.  These departments and individuals do not exist.

42.     The solicitations contain representations that convey the false impression that recipients are receiving notices that they are the recipients of substantial cash prizes, typically more than a million dollars.  Using selectively-emphasized text, the solicitations stress the recipient is "confirmed," "eligible," "verified," or "approved."  *See* Exhibits 4-6.  Some solicitations convey the sender's excitement about the opportunity to inform the recipient about their good fortune.  *See* Exhibit 4.

43.     To instill the misimpression that the recipients have won a substantial prize, defendants' solicitations appear personalized, when in fact they are form letters.  They frequently include purportedly unique identification numbers or claim numbers.  *See* Exhibit 1. Some require a signature.  *See* Exhibit 2.  Others bear what appear to be handwritten notes from the sender congratulating the recipient, or urging the recipient to respond with tacit promises of

pending wealth.  *See* Exhibits 3, 4.  Others state—falsely—that the sender has tried to call the recipients or that the fictional sender is personally awaiting the recipients' responses.  *See* Exhibits 5, 6

44.     The solicitations also attempt to convince the recipients that the promised wealth is real.  The solicitations often falsely reassure the recipients that "this is the real thing," or that the solicitations are "not [] form" letters.  *See* Exhibits 5, 7.

45.     The solicitations reinforce the impression that a large cash prize is awaiting the recipients by creating a false sense of urgency.  The solicitations warn that this is the recipients' "last chance," or that absent a swift response from recipients, the sender will strike the recipients' names from the list of claimants.  *See* Exhibits 1, 8.

46.     The solicitations instruct the recipients to fill out a response card and mail it, along with the required fee, to one of several mail boxes rented on behalf of the direct mailing defendants.  The response cards often require recipients to confirm they are in fact the named-recipient or authorize shipment of the promised prize.  *See* Exhibits 4, 9.  The response cards also contain a bar code unique to each recipient.

47.     The solicitations contain disclosures that contradict the representations and describe—vaguely—the solicitations' actual offer, a list of publicly-available sweepstakes.  The disclosures are presented in a manner that substantially reduces or eliminates their effectiveness. They are printed either on the back of the solicitations, in full-justified, dense font, or on the face of the solicitations in small, block-print.  *See* Exhibit 1, p. 2; Exhibit 5, p. 4.  These inconspicuous disclaimers do not counteract the solicitations' overall impression that the recipients will receive thousands of dollars or other prizes if they pay the fee.

48.     Despite the solicitations' representations that the recipients have won substantial cash awards, victims who respond to the solicitations do not receive a prize.  Instead, they receive a nearly worthless sweepstakes bulletin containing information about publicly-advertised sweepstakes.  While many of the solicitations proclaim that recipients could win over a million dollars, in reality doing so would require herculean efforts, a nearly impossible amount of luck, and, likely, defrauding the sweepstakes operators.  For instance, to win the $1.2

9

million listed on one sweepstakes bulletin created for Kern, an individual would have to—among other things—submit over 7,000 entries to nine sweepstakes contests and have each entry selected as a winner. *See* Exhibit 10. Many of the sweepstakes do not award cash, but rather offer prizes of sometimes nominal value, such as music streaming membership, bags of popcorn, and branded merchandise. Although the solicitations often stress the recipients are "eligible" for the promised awards, that too is a misrepresentation. For instance, one sweepstakes contest identified in the bulletin was only open to Federal Aviation Administration registered pilots.

49.    Kern and her associates often mail the same solicitation using multiple companies, with only graphic or minor textual changes. *See* Exhibits 1, 7.

**B.    Identifying potential victims**

50.    Kern and her associates identify solicitation recipients in two ways.

51.    *First*, Kern and Burrow work with list brokers to identify lead lists owned by third parties that contain names and addresses of individuals most likely to respond to the scheme's fraudulent mass mailings. After Burrow and Kern order lead lists from brokers, the brokers send the lists to Fennell and Neptune. Fennell removes incorrect addresses and duplicates entries from the lead lists provided by list brokers.

52.    *Second*, Kern and her associates maintain a database of individuals who have responded to their solicitations, referred to as "buyers." Kern and her associates create this database using the unique bar code printed on the bottom of each solicitation. When a victim returns the response card and fee, Burrow scans the bar code and sends the information to Fennell and Neptune. Fennell compiles the victim information into a database. Kern then directs additional solicitations be sent to those victims. Kern also rents that data through a list broker to other direct mailing schemes, resulting in victims receiving additional solicitations from similar schemes.

**C.    Printing the Solicitation Packets**

53.    Printers "personalize," print, and prepare for mailing thousands of nearly identical copies of the solicitations.

54. New Generation Graphics has served as one of Kern's printers since at least 2011.

55. NSD Products has served as one of Kern's printers since at least 2013.

56. Each printer receives an art file containing the text and art for a solicitation, as well as the accompanying outer envelopes and inner pre-addressed return envelopes. Before printing and preparing the solicitations, the printer send a proof to Kern for her approval. At times, Kern edits the solicitation and returns it to the printer, which makes revisions and returns it to Kern for her final approval.

57. After Kern approves the solicitation, the printer prints the packet pieces, including the outer envelopes and inner pre-addressed return envelope. The printer uses the recipient information from lead lists and the "buyers" database to "personalize" the solicitations, adding each recipient's name to the solicitation in appropriate places and a unique bar code to the response card.

58. The printer then folds and inserts each solicitation, along with a return envelope, into the outer envelope, and seals the outer envelope. The printer delivers the finished product to mailing houses, which introduce the letters into the U.S. mail.

**D.    Processing Victim Responses**

59. The pre-addressed return envelope contained in the solicitation packets facilitate the remittal of victim payments. Using those envelopes, victims send their payments to mail boxes rented on behalf of Kern and her associates.

60. Victim returns are currently mailed to at least the following locations: six mail boxes located in Congers, New York; five mail boxes located in Miami Lakes, Florida; and one mail box located in Orlando, Florida. Additionally, the Kern and her associates have previously used mail boxes in at least the following states: Arkansas, Illinois, Minnesota, California, New Jersey, Nevada, Utah, and Arizona.

61. The responses are forwarded to various addresses in the Las Vegas area, including—but not limited to—Burrow's home.

62.    Burrow, among others, opens the victim responses and reviews them for payment, a process known as caging.

63.    Burrow scans the bar code at the bottom of each paying victim's response.  That information is uploaded into the "buyers" database.  Burrow then collects and deposits the victim payments.

64.    At times, the returns contain handwritten notes from victims.  Some of these notes inquire about the status of the winnings or thank the benefactor responsible for the solicitation.  Burrow discards these victim responses.

**Specific Misrepresentations**

65.    The fraudulent solicitations described below are typical of the more than 50 different fraudulent solicitations sent by Kern and her associates.

**"Sworn to Secrecy"**

66.    One solicitation sent by direct mailing defendant Imperial Award Services creates the false impression that the recipient's name has been drawn for "confirmed prizes" of "over $3,341,006.00."  Exhibit 4.

67.    The heading of the solicitation proclaims in large, lavish font "YOU ARE OFFICIALLY SWORN TO SECRECY" and includes a header stating, "MARKETING IMAGE DIRECT OFFICIALLY DRAWN TO FOUR PRIZED NAMES (FOR THE PRIZE RECORD)." The solicitation contains the following misrepresentations.

- A graphic resembling a handwritten note that states, "Congratulations from all of us—been trying to reach you"

- "NAME NO 1. [RECIPIENT NAME] [RECIPIENT STATE]" followed by a checkbox next to "confirmed prizes over 43,341,006.00" and a checkbox stating "uncollected"

- "Reported confirmed Prize Re Drawn Prize Name: [RECIPIENT NAME]"

68.    The solicitation contains a disclaimer written in tiny, closely spaced, block text stating, in part, "IAS is a service offered to our customers that provides information on available sweepstakes that are open to the public for entry, subscribers are solely responsible for

investigation, viewing, and complying with any and all rules, restrictions, requirements, or provisions set for in the sweepstakes."  The inconspicuous disclosure does not remedy the overall impression of the solicitation, namely, that the recipient's' name has already been drawn for a large "uncollected" cash prize.

69.    The solicitations instruct the recipient to send a "report-release fee of $20" as well as swear to the following statement

> "I've been legally accorded entry-into-contract-status (which cannot be withdrawn for any reason except failure of a timely response) as <u>NAME NO. 1</u> for the following <u>CONFIRMED</u> prizes…noted this date of dedicated confirmed status <u>07/27/2017</u> in the reviewed Status Report Entitlment….as still <u>UNCOLLECTED</u> by [RECIPIENT'S NAME] over the amount of: <u>$3,341,006.00 *** THREE MILLION THREE HUNDRED FORTY-ONE THOUSAND AND SIX U.S. DOLLARS***</u>."  (Ellipses in original.)

### "Last Chance Voucher"

70.    A solicitation sent by direct mailing defendant Montgomery Marketing Inc. LLC purportedly notified recipients that $1,239,745.00 was awaiting them.  *See* Exhibit 1.

71.    The solicitation purports to be from Montgomery Marketing's "Notification Division" and is the "LAST CHANCE VOUCHER."  It includes a specific "VOUCHER NUMBER" and a "RECOGNIZED STATUS" of "Verified and Confirmed."  The solicitation contains the following misrepresentations.

- PENDING MONIES SLATED AND EARMARKED FOR: Issued To: [RECIPIENT'S NAME]

- ---THIS IS THE REAL THING --- If you have ever responded before dreaming of a win, but the winnings have not been to your expectations, **I FIRMLY URGE YOU** to read this because this is the **REAL ONE**.  We hope that we will help you to have your life **SHOWERED** with funds if the contest winner requirements are **REALIZED** and for which you are **EMINENTLY QUALIFIED!**

- Be apprised that M.M.I. Notification Committee received a DIRECT EXECUTIVE ORDER from the HIGHEST CORPORATE LEVEL to release

this PROPRIETY PAPERWORK by earliest possible delivery methods to your residence. Please continue to verify the balance of this memorandum identifying you by FULL NAME QUALIFIED ENTRANT we are seeking to deliver the enumerative documents.

72. The solicitation contains a graphic resembling a handwritten note stating, "This person has been <u>GUARANTEED TO RECEIVE!</u> If no response in <u>7 DAYS</u>, I authorize you to offer this opportunity to the next recipients as discovered by corporate investiture."

73. The back of the solicitation contains a disclaimer entitled "COMPENDIUM REPORT INFORMATION" that discloses Montgomery Marketing Inc. "is a private compiling and reporting firm" that "makes available full entry directives for known cash and prizes." The inconspicuous disclosure does not remedy the overall impression of the solicitation, namely, that the direct mailer is urgently notifying the recipient of one last chance to claim a large cash prize.

74. Another entity used by Kern and her associates, Assets Unlimited, mailed this same solicitations with some graphic changes. *See* Exhibit 7.

"Notice of Non-Redemption"

75. A solicitation sent by direct mailing defendant Distribution Reporting Center Inc. purportedly offered recipients one last chance to claim a $621,382.00 sweepstakes prize, directing the recipient to return "Form 5050a" as well as the processing fee of $20 to claim their prize. *See* Exhibit 5.

76. The solicitation is styled as a personal letter sent by "James Edgemore" from the "Office of the Comptroller." The solicitation contained a large graphic stating the communication was the "FINAL NOTICE," a "LEGAL DISCLOSURE," as well as "PRIVATE CONFIDENTIAL." The solicitation contains the following misrepresentations:

- What a pity. I was reviewing the records and I found that you were **100% DEFINITELY ELIGIBLE** for a **HIGH VALUE of cash DIRECTIVES** from our company.

- [RECIPIENT NAME] PLEASE READ CAREFULLY!  THIS IS A REAL CASH DIRECTIVE LETTER.  DO NOT CONFUSE THIS WITH JUNK MAIL OR FORM LETTERS

- P.S. [Recipient name], notice the return envelope is addressed to me personally!  That's because I know you realize this is the real deal, it is not a "form" letter.  I will PERSONALLY be on the lookout for the letter from you, and I will RUSH IT THROUGH ALL THE RED TAPE.  You'll be treated like the FIRST CLASS IMPORTANT CLIENT YOU ARE TO [sic] US, [Recipient Name].

77.     The solicitation also contains two "handwritten" notes from "James Edgemore." One states, "This person is 100% eligible to possibly win a lot of money if he is the successful entrant.  Please give him <u>one more chance</u> to communicate with us!! James Edgemore."  The other congratulates the recipient, "Best of luck on everything in your life from now on and I sincerely congratulate you.  Please get this in <u>on time</u>, so I can fill my end of the bargain—Guaranteed!! JE."

78.     The back of the solicitation contains a disclaimer entitled "COMPENDIUM INFORMATION" that discloses Distribution Reporting Center "is a private compiling and reporting firm" that "makes available full entry directives for known cash and prizes."  The inconspicuous disclosure does not remedy the overall impression of the solicitation, namely, that the direct mailer, by way of "James Edgemore," is informing the recipient of a final chance to claim a sweepstakes prize.

79.     A nearly identical solicitation was mailed by another company used by Kern and her associates, Promotional Marketing Solutions, and was attached to a complaint filed against that company in April 2012.

### Defendants' Knowledge of the Fraud

**A.     Direct Mailing Defendants:  Defendant Patti A. Kern and Direct Mailing Corporations**

80.     Defendant Patti A. Kern has owned and operated direct mailers since at least 2004.  While most of Kern's mailing campaigns followed this sweepstakes model, she also sent

out other solicitations that promised valuable prizes, and/or unique items with important mystical characteristics, in return for a relatively small fee.

81.    Kern knows that her solicitations contain false and misleading statements that induce victims to send payments to direct mailing companies operating at her direction.  Despite this knowledge Kern continues to operate mass mailing schemes.

82.    Kern knows that beyond a bald corporate filing, the organizations purporting to send the solicitation packets do not exist, nor do the individuals purportedly authorizing the release of the funds, personally watching for the recipient's response, or attempting to telephone the recipient.

83.    Kern knows that the individuals who respond to her solicitations do not receive large checks or prizes.  Kern knows her direct mailing companies mail thousands of solicitations a week, but does not pay any substantial monetary awards or send prizes to anyone.

84.    Kern knows that the individuals receiving her solicitations believe they have won a substantial prize.  She responds when victims complain that they have not received their prize. At one point, Kern stopped sending a particular solicitation to residents of California because the return address for that solicitation was in California and victims were going to the mailbox location asking for their prize.

85.    Kern also knows the solicitations are fraudulent because on six occasions the United States Postal Inspection Service ("USPIS") filed administrative complaints against the companies through which she mailed solicitations.  Each complaint alleged that the named entities were conducting a scheme or device for obtaining money or property through the mail by means of false representation.

86.    In each instance, the solicitation(s) attached to the complaint were substantially similar to and contain the same types of misrepresentations as the fraudulent award solicitations Kern currently mails.

87.    In each instance, the named companies and/or individuals signed a cease and desist order, agreeing to stop making direct or indirect representations that recipients have won an award, are part of a select group of people, or will forfeit an award absent a prompt response.

They also agreed to stop representing that solicitations are anything other than an offer to sell a sweepstakes report.

88.   Kern knew about each cease and desist order.

89.   When companies Kern directed received cease and desist orders, a new corporation as opened and, under Kern's direction, those corporations sent out solicitations containing the same or similar representations as those attached to the USPIS complaints.

90.   Despite her knowledge of the fraud, Kern continues to facilitate the mailing of fraudulent solicitations.

<u>NSD Products Cease and Desist</u>

91.   In June 2011, USPIS filed a complaint against Edgar Del Rio and NSD Products.

92.   Kern operated NSD Products and was aware of the complaint, telling an associate she was "pissed off at post office one of my/not mine companies received a cease and desist today.  So watch your back."

93.   On June 1, 2011 defendant Del Rio signed a cease and desist order, in his personal capacity and as an officer of NSD Products.

94.   Kern was not deterred by the cease and desist, telling Fennell, "NSD got a [Cease and Desist].  No worries already getting set up elsewhere."

95.   Under Kern's direction and with Del Rio's assistance, solicitations originally sent by NSD Products were edited and sent out by other direct mailing companies.

<u>Promotional Marketing Solutions Cease and Desist</u>

96.   In July 2012, USPIS filed a complaint against Promotional Marketing Solutions, Inc. and Michael Keith Kern.

97.   Kern operated Promotional Marketing Solutions.  Kern previously noted that Promotional Marketing Solutions "belongs to me via my hubby."

98.   On April 25, 2012, Kern's husband signed a cease and desist order in his personal capacity and as an officer of Promotional Marketing Solutions.

99.    In May 2012, Kern identified two Promotional Marketing Solutions solicitations, telling O'Connor that they were "[t]he two best promo's [sic] to redo" for another of Kern's companies.

100.    In November 2017, direct mailing defendant Distribution Reporting Center mailed a solicitation nearly identical to the solicitation attached to the complaint against Promotional Marketing Solutions.

<u>M.K.I. Services, Inc. Cease and Desist</u>

101.    In August 2012, USPIS filed a complaint against M.K.I. Services, Inc. and one of its officers, an individual believed to be Del Rio's brother.

102.    Kern directed M.K.I. Services, Inc.'s mailing activities.

103.    On August 1, 2012, M.KI. Services, Inc. and its corporate officer signed a cease and desist order

104.    In February 2017, direct mailing defendant Global Data Funding, Inc. mailed a solicitation nearly identical to the solicitation attached to the complaint against M.K.I. Services, Inc.

<u>Southwest Processing Center, Inc. Cease and Desist</u>

105.    In August 2012, USPIS filed a complaint against Southwest Processing Center, Inc. and one of its officers, another individual also believed to be Del Rio's brother.

106.    Kern directed Southwest Processing Center Inc.'s mailing activities.

107.    On August 2, 2012, Southwest Processing Center, Inc. and its corporate officer signed a cease and desist order.

108.    In September 2014, Kern and Del Rio discussed editing one of Southwest Processing Center's solicitations, so it could be mailed by a new company, All American Awards, Inc.

<u>Platinum Award Service, Inc. Cease and Desist</u>

109.    In June 2013, USPIS filed a complaint against Platinum Award Service, Inc. and one of its corporate officers.

110.    Kern directed Platinum Award Service's mailing activities.

111.    On January 2, 2013, Platinum Award Service and its corporate officer signed a cease and desist order.

112.    On January 3, 2013, Kern emailed Fennell, telling him "[Platinum Award Services got a [cease and desist]." She also told Fennell to "change the promo" from Platinum Award Service to another corporation, noting "it's the same promo but switching companies."

113.    In addition to the four cease and desists described above, two other companies operated by Kern were named in USPIS complaints and signed cease and desist orders: G.A.M. in April 2012, and Equity Research Network in October 2012.

114.    Kern has actively worked to conceal her activities and identity from law enforcement. Although Kern controls the direct mailers, she keeps her name off corporate documents. She also directed her vendors not to identify her. On May 13, 2014, Kern sent an email discussing official actions taken against her companies and her efforts to conceal her identity.

> I had to sigh a cease and desist order along with some pretty large fines . . . I even tried it after that putting everything in Michael[ ] [Kern's] name and he was shut down in 6 months. He only had to sigh the [cease and desist] thank god . . . To this day I can not have my name on anything even remotely close to a sweeps or a sweeps report promotional company. Don't want to go to jail. Right now I help out a couple of Mexican's who have a printing and lettershop of there own with their mailings for Casino's, etc.and they know that I do not exist if anybody asks what I am dong there even if it doesn't have to do with sweeps. [sic throughout]

115.    Kern also passed responsibility for communicating with her list broker to Burrow, telling Burrow and Fennell that she was "[g]oing to be under ground [sic] on this."

**B.    Printer Defendants: Edgar Del Rio, NSD Products, Sean O'Connor, Epifanio Castro, and New Generation Graphics**

<u>Edgar Del Rio and NSD Products, Inc.</u>

116.    Printing defendant Edgar Del Rio and NSD Products, Inc. know that the solicitations they print and distribute for Kern and the direct mailing companies are false and misleading.

117.    Del Rio knows that the mass-produced solicitations indicate the recipients are winners of large prizes.  Del Rio also knows that the individual recipients are not prize winners because he "personalizes" and prints thousands of copies of each solicitation packet.

118.    Del Rio and NSD also know the solicitations are false and misleading because, prior to July 2011, Del Rio and NSD sent out solicitations that, as described in paragraphs 91 through 95, resulted in a USPIS complaint, alleging those mailings were part of a scheme or device for obtaining money or property through the mail by means of false representation.  Del Rio and NSD Products signed a cease and desist order prohibiting them from sending similar mailings.

119.    Del Rio had ownership interest and control over additional direct mailers formerly directed by Kern, including M.K.I. Services and Southwest Processing Center.  Del Rio knew that both companies signed cease and desist orders agreeing to stop sending deceptive mailings.

120.    After law enforcement took action against three of his companies due to the false and misleading solicitations, Del Rio opened at least one new direct mailing company, All American Awards, Inc.

121.    With Kern's assistance, Del Rio caused at least one solicitation sent out by one of the enjoined companies, Southwest Processing Center, to be sent out by his new direct mailing company, All American Awards.

122.    Del Rio has also actively worked to conceal his, Kern's, and Castro's identities. He recruited family members to open corporations and secure mail boxes in their names.

123.    Despite Del Rio's knowledge of the fraud, Del Rio and NSD Products continue to facilitate the mailing of fraudulent solicitations.

<u>Sean O'Connor</u>

124.    Printing defendant Sean O'Connor knows that the solicitations he prints for Kern and the direct mailing defendants are false and misleading.

125.    O'Connor has worked for various printing firms used by Kern since at least 2011.  He currently assists Del Rio and NSD Products with printing Kern's solicitations.

126.    O'Connor also helped Kern acquire new solicitations.  On at least three occasions in 2011 and 2012, he procured draft solicitations from a graphic artist and made edits and suggestions before sending Kern the solicitations for the scheme's use.

127.    O'Connor knows that the mass-produced solicitations indicate the recipients are winners of large prizes.  O'Connor also knows that the individual recipients are not prize winners because he "personalizes" and prints thousands of copies of each solicitation.

128.    O'Connor also knows the solicitations are false and misleading because he knows law enforcement took action against companies through which Kern and her associates mail fraudulent solicitations, including M.K.I. Services Inc. and Southwest Processing Center.

129.    In spite of his knowledge that the solicitations are fraudulent, O'Connor continues to participate in the fraudulent scheme by printing thousands of solicitation packets.

<u>Epifanio Castro and New Generation Graphics, Inc.</u>

130.    Printing defendants Epifanio Castro and New Generation Graphics, Inc. know that the solicitations they print for Kern and the direct mailing companies are false and misleading.

131.    Castro and New Generation know that the mass-produced solicitations indicate the recipients are winners of large prizes.  They also know that the individual recipients are not prize winners because they "personalize" and print thousands of copies of each solicitation.

132.    Castro also knows the solicitations are false and misleading because, beginning as early as 2011, he previously participated in this scheme as a direct mailer.

133.    Castro had an ownership interest in and control over direct mailers directed by Kern, including M.K.I. Services.  He knew USPIS served M.K.I. Services with a cease and desist relating to its fraudulent mailings.

134.    After M.K.I. Services signed a cease and desist order, Castro had an ownership interest in at least one additional direct mailer.

135.    Castro conceals his identity as a direct mailer.  None of the direct mailing companies in which he had an ownership interest were incorporated in his name, nor did he open any of the mail boxes in his own name.

136.    Despite Castro's knowledge of the fraud, he and New Generation continue to facilitate the mailing of fraudulent solicitations.

**C.    Caging Defendant:  Andrea Burrow**

140.    Caging defendant Andrea Burrow knows that the solicitations are false and misleading, but continues to assist the scheme.

141.    Burrow knows the solicitations contain misrepresentations.  Burrow opens victim return envelopes, which sometimes contain the full solicitations.  Even when victims return only the response cards with the fee, the fraudulent nature of the solicitations is clear.

142.    Burrow knows that victims believe they have won a substantial cash prize.  At times, victims return handwritten notes inquiring about the status of their prize, expressing gratitude to the solicitation's sender for the award, or pleading for the award to be sent.  *See* Exhibit 11.  When she cages these responses, Burrow sees—and discards—these communications.

143.    Despite Burrow's knowledge of the fraud, she continues to facilitate the mailing of fraudulent solicitations by acquiring lead lists, receiving and caging victim returns, and depositing victim payments.

**D.    Data Defendants:  Stephen Fennell and Neptune Data Services, Inc.**

144.    Data defendants Stephen Fennell and Neptune Data Services, Inc. know that they contribute to victims receiving fraudulent solicitations.

145.    Fennell knows that the mass-produced solicitations indicate that recipients are winners of large prizes.  Fennell also knows that the recipients are not winners, because he knows that recipients are identified by using rented lead lists and that solicitations are mailed by the thousands.  He also knows that Kern re-targets individuals who have previously responded to solicitations.

146.    Fennell also knows that law enforcement have taken action against the companies through which Kern and her associates send fraudulent solicitation, including NSD Products and Promotional Marketing Services.  He also knows that when law enforcement shuts

down one company, Kern and her associates operate new companies that send out the same or substantially similar solicitations.

147.    Despite Fennell's knowledge of the fraud, he and Neptune continue to facilitate the mailing of fraudulent solicitations.

**Harm to Victims**

148.    Victims, especially elderly and vulnerable victims, suffer financial losses from the mail fraud scheme that defendants perpetrate.  Victims pay Defendants approximately $1.6 million each year through roughly 80,000 responses to solicitations containing the types of misrepresentations described above.  Many individuals are victims of multiple direct mailing schemes run by the defendants.  If unabated, this number will rise and continue harming victims.

149.    Defendants' fraudulent scheme is ongoing.  Absent injunctive relief by this Court, Defendants will continue to cause injury to recipients of these solicitations.

Count I

(18 U.S.C. § 1345 – Injunctive Relief)

150.    The United States realleges and incorporates by reference Paragraphs 1 through 149 of this Complaint as though fully set forth herein.

151.    By reason of the conduct described herein, defendants violated, are violating, and are about to violate 18 U.S.C. §§ 1341 and 1349 by executing schemes and artifices to defraud, or for obtaining money or property by means of false or fraudulent representations with the intent to defraud, and, in so doing, use the United States mail.

152.    Upon a showing that defendants are committing or about to commit mail fraud, the United States is entitled, under 18 U.S.C. § 1345, to a temporary restraining order, a preliminary injunction, and a permanent injunction restraining all future fraudulent conduct and any other action that this Court deems just in order to prevent a continuing and substantial injury to the victims of fraud.

153.    As a result of the foregoing, defendants' conduct should be enjoined pursuant to 18 U.S.C. § 1345.

**Prayer for Relief**

WHEREFORE, plaintiff United States of America requests of the Court the following relief:

**A.**    That the Court issue an order, pursuant to 18 U.S.C. § 1345, pending a hearing and determination of the United States' application for a preliminary injunction, that defendants, their agents, officers and employees, and all other persons or entities in active concert or participation with them, are temporarily restrained from:

i.    committing mail fraud, as defined by 18 U.S.C. §§ 1341 and 1349;

ii.    using the United States mail, or causing others to use the United States mail, to distribute any advertisements, solicitations, or promotional materials:

(a)    that represent, directly or indirectly, expressly or impliedly that the recipient has won, will win, or will receive cash, prizes or awards;

(b)    that offer for sale of information regarding sweepstakes or lotteries;

(c)    that represent, directly or indirectly, expressly or impliedly, that the recipient of the solicitation was specifically selected to receive the mailing based on a reason other than the fact that the recipient's name appears on a mailing list; or

(d)    that contain any other false or misleading representations;

iii.    receiving, handling, opening, or forwarding any mail that responds, by sending payment or otherwise, to materials described in subparagraph (ii)(a)-(d), *supra*;

iv.    selling, offering for sale, leasing, or offering for lease any lists of U.S. residents or mailing lists of any type compiled from U.S. residents who have responded to any of the materials described in subparagraph (ii)(a)-(d), *supra*, thereby causing such materials to be sent to U.S. residents;

v.    performing "caging services" on mail received from U.S. residents in response to any of the materials described in subparagraph (ii)(a)-(d), *supra*, including opening mail received from U.S. residents; entering or inputting data about U.S. residents into a database or forwarding such data; handling, forwarding, or depositing payments received from U.S. residents, including currency, bank

checks, certified checks, money orders, or credit card charge authorizations; or handling or forwarding any mail received from U.S. residents;

vi.  destroying, deleting, removing, or transferring any and all business, financial, accounting, and other records concerning defendants' operations and the operations of any other corporate entity owned or controlled, in whole or in part, by defendants.

**B.**  That the Court further order that, pursuant to 18 U.S.C. § 1345, within 2 days from defendants' receipt of this Temporary Restraining Order and Order to Show Cause, defendants shall provide copies of this Temporary Restraining Order and Order to Show Cause to all graphic artists/copyrighters, list brokers, printer/distributors, mailing houses, data managers, and/or caging services with which they do business regarding the materials described in subparagraph (ii)(a)-(d), *supra*, informing them that they are subject to the Temporary Restraining Order as an entity in active concert or participation with defendants, and within 7 days from defendants' receipt of this Temporary Restraining Order and Order to Show Cause, defendants shall provide proof of such notice to the Court and the United States, including the name and addresses of the entities and/or individuals to whom the notice was sent, how the notice was sent, and when the notice was sent.

**C.**  That the Court further order that, pursuant to 18 U.S.C. § 1345, the United States Postal Service is authorized to detain:

i.  all of defendants' mail, addressed to any post office box, private mail box, or any other address, which is responsive to any of the materials described in subparagraph (ii)(a)-(d), *supra*;

ii.  any of the materials described in subparagraph (ii)(a)-(d), *supra*, and any substantially similar advertisements, solicitations, and promotional materials that are deposited into the United States mail by defendants, their agents, officers, or employees, or any other persons or entities in active concert or participation with them.

1
2

**D.**     That the Court issue a preliminary injunction on the same basis and to the same effect.

3

**E.**     That the Court issue a permanent injunction on the same basis and to the same effect.

4
5

**F.**     That the Court order such other and further relief as the Court shall deem just and proper.

6
7

Dated this 18th day of April 2018.

8
9

DAYLE ELIESON
United States Attorney

10
11
12

TROY K. FLAKE
Assistant United States Attorney
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101

13
14
15

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

16

ETHAN P. DAVIS
Deputy Assistant Attorney General

17
18
19

GUSTAV W. EYLER
Acting Director
Consumer Protection Branch

20

JILL P. FURMAN
Deputy Director

21
22
23

 /s/ Jacqueline Blaesi-Freed
JACQUELINE BLAESI-FREED
Trial Attorney

24
25
26
27
28